UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ITServe Alliance, *et al.*, | ) | C/A No.: 1:18-cv-2350-RMC |
| | ) | (Lead case in consolidated cases) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| L. Francis Cissna, Director, United States | ) | |
| Citizenship and Immigration Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEFING

At the hearing on May 9, 2019, this Court recognized that the February 2018 Memo coincided with a stark uptick in H1B denials. Arg. Transcr. at 11:5-6. Yet, in the face of such disparate results, the Agency argued that the February 2018 memo changed nothing. *Id.* at 11:2-4. The Court pushed back: "Well, if it's not changing things, the question then becomes why are the results so different?" *Id.* The Court identified the tension between the Agency's litigation position and the facts. Thus, the Court asked the Agency brief three issues: (1) whether discovery is appropriate to discern the true "nature" of the change wrought by the February 2018 Memo; (2) whether the Agency had a proposed remedy for the unreasonable delays in H1B visa adjudications; and (3) whether this February 2018 Memo increased H1B adjudication times. Arg. Transcr. at 13:1-10, 27:3-15.  The Agency filed its supplemental brief on May 23, 2019. [ECF No. 20]. For the reasons below, this Court should allow the Plaintiffs to engage in discovery to identify the Agency's actual intent behind the February 2018 Memo and the actual reasons for the unreasonable delays associated with H1B applications for IT consulting companies.

I. **The Agency's actual intent for the legislative rules articulated in the February 2018 Memo presents a question of fact.**

The Court is presented with multiple challenges[1] to denied H-1B visa petitions which are all driven by the agency's two unlawful legislative rules:

> If the petitioning employer has at least one employee who performs services at a client location then the employer must provide proof of actual control over all aspects of the employee's day to day work activity; and,

> If the petitioning employer has at least one employee who performs services at a client location then the employer must provide proof of "specific non-speculative work assignments" for the entire duration of the H-1B visa.

These rules only apply to petitioning employers whose employees perform services at client locations ("targeted employers"). Failure to provide this evidence results in full denial of the H-1B visa petition or a partial denial (for shorter duration). The partial denials are (apparently) based on the application of the unlawful requirement to prove non-speculative work assignments. The cases also challenge the legal ability to partially deny an H-1B visa. Plaintiffs allege that these rules are unlawfully created legislative rules, and consequently decisions based upon the rules are invalid.

---

[1] The Agency again repeats its claim that the consolidated cases comprise an improper programmatic challenge to the February 2018 Memo. Gov't Br. at 1-9. The Agency argues that challenges to the Agency's rules should proceed in a "case-by-case approach." *Id.* However, the Agency fails to recognize that the consolidated cases are a case-by-case approach. Each consolidated case represents an individual final agency action where the Agency's rules have been applied and caused a plaintiff harm. And this Court is called upon to determine if the rules exist and if they are unlawful. As seen by the cases cited by the agency, the prohibition on programmatic challenges does not preclude review of large numbers of cases filed by aggrieved parties, but rather prohibits vague facial assertions of agency wrongdoing and pleas for wide ranging judicial oversight of executive functions. *See id.* at 8, note 1. The agency also makes an argument best categorized as an "appeal to tradition" (also known as argumentum *ad antiquitatem*, appeal to antiquity, or appeal to common practice). The argument essentially takes the form of "this is right because we've always done it this way." In essence the agency states that because it has been violating the law for a long period of time the Court should acquiesce to this behavior. The agency points to no law that articulates this principle.

In the event the Court finds the rules are lawfully created, Plaintiffs' next argument is that the rules, and decisions based thereon, are arbitrary and capricious.  The "arbitrary or capricious" provision -- is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs.  *Association of Data Processing Service Organizations, Inc. v. Board of Governors of Federal Reserve System*, 745 F.2d 677, 683, (D.C. Cir. 1984).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).  "At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Id.*

In their response brief, the Agency again argues the difference between legislative and interpretative rules (though this does not address the question presented for supplemental briefing). Courts generally refer to the category of rules to which the notice and comment requirements do apply as "legislative rules" or, sometimes, "substantive rules."  *Mendoza v. Perez*, 754 F.3d 1002, 1020-1021 (D.C. Cir. 2014).  An agency is generally required by the APA to publish notice of proposed rulemaking in the Federal Register and to accept and consider public comments on its proposal. 5 U.S.C. § 553.  The APA exempts from these procedural requirements: (1) interpretative rules; (2) general  statements of policy; and (3) rules of agency organization, procedure, or practice. *Id*.

Interpretive rules "describe the agency's view of the meaning of an existing statute or regulation." *Id*.   The hallmark of the court's inquiry in distinguishing legislative rules from interpretative rules "is whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Id*. Interpretative rules are those that clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or "merely track[]" preexisting requirements and explain something the statute or regulation already required. *Id.*   To be interpretative, a rule "must derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Id.*

A legislative rule, on the other hand, "is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy.  *Id.* "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Id.* (policy memo that ignored the general rule of the regulation could not be deemed to interpret it.).   When evaluating agency rules for legislative effect courts are mindful that "the purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation . . . and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations.  *Id.* at 1022.   The test Courts apply when making factual and legal determinations on the legislative nature of a rule is succinctly put here:

(i)   did the agency express its intention as to whether it is a legislative rule;

(ii)  does the rule amend a prior legislative rule; and

(iii) does the agency leave adjudicators free to exercise their discretion and disregard the rule or is it binding on the agency and public?

*See Funeral Consumer Alliance, Inc. v. FTC*, 481 F.3d 860, 863-64 (D.C. Cir. 2007)

At argument and in its brief the agency points to sporadic examples of where the agency has historically taken action consistent with the February 2018 memo. However, if, as the agency asserts to this Court, these rules had always been in place from the beginning of the H-1B visa, then companies in the targeted employer category would have been excluded long ago. However, this is not the case. These targeted employers have been participating in the H-1B visa for 30 years.

The agency argues that the rules in the February 2018 memo are "guidance" and grant adjudicators discretion to act. This may have been true in the past, which would explain the sporadic application of these rules.[2] However, since the February 2018 memo it is clear that the rules have transcended "guidance" and are now legislative rules that set conditions for approval of benefits and alter the legal relationship between targeted employers and the agency.

## II.   Discovery in APA Cases is Permissible When the Agency has Engaged in Affirmative Misconduct or Bad Faith and When the Agency Failed to Provide a Reason for a Final Agency Action.

Discovery is necessary in this case for the Court to answer the legal questions presented by this case. Generally, discovery beyond the administrative record is required in two situations: when it "provides the only possibility for effective judicial review and … there have been no

---

[2] If the rules were guidance, the application of the rules would be reviewable under the arbitrary and capricious standard. Given the fact that H-1B visa are temporary benefits, most employers historically could not justify the litigation expense to hire a single employee. This is especially true when considering the time lost on the visa due to court process. Even if successful, the visa would be valid for at best two years, which hardly gives the employer time to recoup the cost of litigation. Also, given how rare and sporadic the application of the rules were, employers could refile with the agency with a high likelihood of the petition being approved the second time around. Only now that the agency requires adjudicators to strictly apply these rules across the board have employers been forced to spend resources and time to challenge denials.

contemporaneous administrative findings" (so that without discovery the administrative record is inadequate for review), and when "there has been a strong showing of bad faith or improper behavior" (so that without discovery the administrative record cannot be trusted). *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 458 (D.C. Cir. 1994), citing *Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990). *See also Neighborhood Assistance Corp. of Am. v. United States* HUD, 2011 U.S. Dist. LEXIS 91571, *3, 2011 WL 3611461, citing *Eugene Burger Management Corp. v. United States Dep't of Housing and Urban Dev.*, 192 F.R.D. 1, 12 (D.D.C. 1999) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 458, 305 U.S. App. D.C. 351 (D.C. Cir. 1994)) (stating that one of the two circumstances in which discovery in an APA case is permitted is where there has been "a strong showing of bad faith or improper behavior so that without discovery the administrative record cannot be trusted."); see also *Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 230-31 (E.D.N.Y. 2006) (stating that despite the general "record rule" governing judicial review of agency action, an extra-record investigation by the reviewing court may be appropriate where there has been a strong preliminary showing of bad faith or improper behavior on the part of the agency); *Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246-47 n.1 (11th Cir. 1996).

### A. The agency failed to create a contemporaneous explanation of its actions and discovery is necessary for effective judicial review.

Here, discovery is necessary for effective judicial review. First, the Agency failed to articulate its rationale for partial denials, and discovery is required to determine the agency basis for these actions. *See Saratoga Dev. Corp.*, 21 F.3d at 458. The agency is also required to provide an administrative record when it creates legislative rules. The agency has not maintained an administrative record for these rules, and such record is necessary for the Court to properly evaluate the agency's legislative intent behind the rules

**B.   Discovery is necessary to determine agency intent and the factors the agency considered.**

Second, discovery is necessary to discern the Agency's actual intent when it issued the February 2018 Memo. The agency has created a rule that divides H-1B petitioners into two categories and applies different evidentiary requirements to each.  This Court must determine whether the agency intended its employees, and the targeted employers, to comply with these rules. Determining the intent behind these rules is inherently a factual inquiry which the agency is intent on avoiding.  After all, as noted by the D.C. Circuit in *Chamber of Commerce of the United States v. OSHA*, 636 F.2d 464, 468 (D.C. Cir.1980):

> [a]scertaining that an agency intended to engage in legislative rulemaking presents a far more difficult inquiry. Divining agency intent is rarely a simple matter, for bureaucratic boilerplate often obscures the true purpose. The administrative agency's own label is indicative but not dispositive; we do not classify a rule as interpretive just because the agency says it is.

The record before the Court includes policy memoranda defining the rules and multiple decisions applying the rules.  The Court has also seen that the agency's Adjudicator Field Manual states that USCIS adjudicators must strictly adhere to the requirements in the policy memoranda. At argument, after speaking with agency counsel, the agency's representative stated:

> The first technical point is about the 2018 Guidance Memorandum. There was a question put forward about the agency's position. The agency's position is adjudicators have to follow the guidance memorandum. We're not disputing that. these policy memoranda must be complied with.

Arg. Transcr. 46: 5-9. The agency states that although the rules must be complied with, it did not intend for the rules to be legislative.  *Id.*  Thus, the question of intent is an open question the Court must resolve.

### C. The agency intentionally created a regulatory Catch-22 with its two rules.

A third consideration in the intent analysis is the fact that the agency's application of the employer-employee relationship rule and the specific non-speculative assignment rule also create a Catch-22 for targeted employers. [3]

On the other hand, the agency demands evidence from the client about the specific projects the employee will work on and why the client requires someone with the employee's particular skill set on the project.[4]

The ultimate "catch" is that the stronger the petitioning employer's actual control over the employee, the less evidence the employer will have regarding the client's particular need for the employee.

The inverse is also true.  If the client has too much input on the employee's activities and projects then the petitioning employer cannot show actual control.  Thus, the agency has created rules that work in opposition to each other, and allow it to deny petitions that do not fall into the undefined Goldilocks.

The agency's legislative intent behind the rules would also be displayed in communication between agency officials and with outside sources.  What sources did the agency rely on when determining it would create these rules?  Are they sources Congress intended the agency to consult?

---

[3] Often times the documents demanded by the agency are inaccessible to targeted employers because they are not a party to the particular contracts demanded by the agency.  If not produced, that agency denies the petition.

[4] Here again, these documents may contain confidential or trade secret material which the client may refuse to divulge.  Without these documents the agency denies the petition.

### D. The agency's intent in creating template RFEs and decision letters.

Fourth, in all of the as applied challenges the underlying denials and requests for evidence are strikingly similar.  This is not the result of mere coincidence.  These documents are the result of templates drafted and approved by agency headquarters.  *See* https://www.uscis.gov/ outreach/feedback-opportunities/review-and-revision-request-evidence-templates (accessed May 28, 2019).  The motive and rationale of the agency when creating template requests for evidence and template denial letters enforcing the rules is likewise a fact question.  When creating templates for adjudicators to use, did the agency intend for them to be binding?  How were adjudicators trained on these rules?  Were they presented as mere "guides" or were they trained that compliance was mandatory?

The motive, rationale, and statements of policy makers when drafting the policy memoranda articulating the rules is a fact question that must that answered before this Court can address the legal question.  Getting "behind the boilerplate," this Court would be benefited from facts showing if and why the agency intended to target and eliminate a particular business model from the H-1B visa program.  Likewise, the question of whether the agency was intending to eliminate nationals from a particular country by enforcing the rules is relevant.

### E.  Discovery is necessary to determine the factors the agency considered.

Further, if the Court determines the rules are lawful then the Plaintiffs continue their fight and challenge the rules and decisions based thereon under the arbitrary and capricious standard. Under this standard the Court evaluates if the agency considered the correct factors when making its decision.  The factual information developed to establish agency intent is also applicable to the

arbitrary and capricious review.  The following issues must be developed and evaluated in discovery to determine if the agency considered the correct factors.

As a threshold matter, discovery is required to remedy the agency's failure to create a contemporaneous explanation of the agency action. Beyond the discovery needed to complete the basis for the individual partial denials, the reason for the agency's rule allowing partial denials based on evidence of specific non-speculative work assignments is relevant to the Court's analysis.

### 1. Factors considered by the agency in partial denials.

The agency is not funded by appropriated tax dollars, but rather runs on fees collected when petitions are filed. The Basic Filing Fee and Application to Extend Status Fees are allowed by statute, but the rate is determined by notice and comment rulemaking.  8 U.S.C. § 1356(m).  All other fees are authorized and determined by statute.  8 U.S.C. § 1184(c)(9)(B).  Fees collected from the H-1B program are used by Defendant to fund a wide variety of activities.  8 U.S.C. § 1356(s).  It is common for targeted employers to pay the following fees for an initial H-1B filing:

| | |
|---|---|
| Basic Filing Fee (8 C.F.R. § 103.7(b)(1)(I)) | $460.00 |
| Dependent H-4 Fee (Spouse or child of H-1B)[5] | $370.00 |
| User Fee (Id. at § (b)(1)(GGG)) | $1500.00 |
| Fraud Prevention Fee (Id. at § (b)(1)(HHH)) | $500.00 |
| Border Security Fee (Id. at § (b)(1)(III)) | $4000.00 |
| Premium Processing (Id. at § (b)(1)(SS) | $1410.00 |

Targeted employers typically pay the following fees for the first extension petition for an H-1B employee to continue in the same position:

| | |
|---|---|
| Basic Filing Fee (Id. at § (b)(1)(I)) | $460.00 |
| Extend Status (Id. at § (b)(1)(X)) | $370.00 |
| Dependent H-4 Fee (Spouse or child of H-1B) | $370.00 |
| User Fee (Id. at § (b)(1)(GGG)) | $1500.00 |
| Premium Processing (Id. at § (b)(1)(SS) | $1410.00 |

---

[5] Beneficiaries of an approve I-140 whose spouse intends to work must also pay the $410 EAD Fee.

It is common for targeted employers to pay the following fees for each additional extension petition for an H-1B employee to continue in the same position:

| | |
|---|---|
| Basic Filing Fee (*Id*. at § (b)(1)(I)) | $460.00 |
| Dependent H-4 Fee | $370.00 |
| Premium Processing (*Id*. at § (b)(1)(SS) | $1410.00 |

The statute and regulatory scheme anticipate the Plaintiff's typical member company who files for an H-1B visa would have an initial three-year petition (filing fees of $8,085) and one extension petition (filing fees $3,925) during the six-year cap period. If the employee is the beneficiary of an approved immigrant visa the employer would pay H-1B extension petition filing fees of $2,055 until the employee becomes a lawful permanent resident.

Discovery is necessary to determine if the Agency began its policy of partial denials/short term approvals in an attempt to force multiple filings, and thus drive up the amount of filing fees the targeted businesses were required to pay. Did the agency consider a self-interested profit motive when implementing this practice? Or, did the agency implement this rule in an attempt to make participation in the H-1B visa cost prohibitive for targeted employers? The communications between agency officials on this point would be telling as to which factors the agency considered when making this rule. Evidence gathered through discovery in the form of comprehensive data on the practice of partial denials and how that corresponds to revenue generated by the agency would also aid the Court in making a decision. The Court could determine from comprehensive data when this practice began in earnest: an issue that his contested between the parties.

The motive, rationale, and statements of policy makers when drafting the policy memoranda articulating the rules is a fact question that must that answered before this Court can address the legal question. Getting behind the boilerplate, this Court would be benefited from facts showing if and why the agency intended to target and eliminate a particular business model from

the H-1B visa program.  Likewise, the question of whether the agency was intending to eliminate nationals from a particular country by enforcing the rules is relevant.

### 2.  Factors considered when making and implementing the "Specific Non-Speculative Work Assignment" Rule.

In its RFEs and denial letters, the agency states that it can "discern" whether a position is so complex that it requires a degree in a specific specialty.  It demands evidence of the exact assignments and project details the IT employee will work on for the duration of the H-1B visa. From this the agency adjudicator determines if the IT position is more complex than a similar position that does not require a degree.  The agency often rejects evaluations conducted by college professors and industry leaders who opine that a bachelor's or higher degree is the minimum requirement for entry into occupation.

However, the agency lacks any identifiable expertise in the information technology field, making its ability to conduct this analysis highly questionable.  For instance, the agency lists it hiring criteria for service center adjudicators on USA JOBS and its Adjudicator Field Manual. Surprisingly, the agency does not require its adjudicators have ***any*** degree, let alone a degree in the specific specialty over which they are adjudicating H-1B visas for.[6]  Appx. 1.

When evaluating the legislative rule, this Court will benefit from seeing the factors the agency considered when determining it had the ability to independently evaluate the relative complexity of various occupations in the information technology industry.

Likewise, the agency's partial denials are based on its "specific non-speculative work assignments" rule.  This Court requires this evidence to evaluate the agency's reasoned decision making in those petitions.

---

[6] Donald Neufeld, the chief of all USCIS Service Center Operations, does not possess a bachelor's degree.

### III.     Discovery is necessary because of agency bad faith or improper behavior.

Here, discovery is necessary because there are viable claims of agency bad faith or improper behavior. The agency seeks to eliminate targeted employers from utilizing the H-1B visa ("targeted employers"). The agency is intentionally and systematically blocking statutorily created immigration benefits and has ceased to "take Care that the Laws be faithfully executed..." *United States Constitution*, Article II, Section 3.

Thus, the agency has engaged in intentional and affirmative misconduct in pursuit of this goal. The indicia of this bad faith or misconduct is see in the agency's actions in the recent past. As discussed in Plaintiffs' briefs, the agency has intentionally delayed processing of H-1B visas and launched a campaign of harassing requests for evidence against targeted employers. Beyond the delays, the agency has begun a coordinated campaign to eliminate targeted employers from the H-1B program, and to remove from the country its employees already admitted on H-1B visas. Many of these employees have been lawfully living in the United States with their families, paying taxes, for over 10 years.

### A. Pattern and Practice of Limiting Duration of Targeted Employer's H-1B Visa Duration is a Pretext for Eliminating Targeted Employers and their Employees from the United States.

First, there is a pattern and practice of limiting the duration of targeted employer's H1B applications as pretext for eliminating targeted employers and their H-1B employees. The authority for partial denials was first publicly articulated in the February 2018 memorandum. The agency points to isolated incidents where this happened in the recent past. However, prior to the memo

the examples provided to this Court are anomalous or were so extremely rare that the practice was unnoticed by immigration lawyers or targeted employers.

The shortened approval periods (of days, weeks, months) required targeted employers to file H-1B visa extension petitions nearly every four to six months instead of every three years. Because the agency previously granted deference to prior H-1B visa petition decisions and did not require a full de novo review of a petition to extend an H-1B visa, this would have been a mere expensive inconvenience. *See Policy Memorandum, The Significance of a Prior CIS Approval of a Nonimmigrant Petition in the Context of a Subsequent Determination Regarding Eligibility for Extension of Petition Validity* ("Deference Memo") (April 23, 2004). However, shortly before unveiling the policy in the February 2018 memo the Agency revoked the Deference Memo, and decreed that all extension petitions would be reviewed *de novo*, with no deference given to a prior decision to approve a petition. *See PM-602-0151, Rescission of Guidance Regarding Deference to Prior Determinations of Eligibility in the Adjudication of Petitions for Extension of Nonimmigrant Status* (October 23, 2017). The intent behind this change, and its effect, is to eliminate H-1B workers who had been in this country for years and had approved immigrant visa petitions and were waiting for green cards.

### B.   Enforcement of Actual Control/Employer Employee Rule and Specific Non-Speculative Work Assignment Rule.

Second, the agency began announcing new policies that are applied to initial H-1B and extension ("continued employment") H-1B petition adjudications. These policies were designed to eliminate the targeted employers from the H-1B visa program. On February 22, 2018, Defendant issued unlawful legislative rules via a "policy memorandum" (PM-602-0157) and explicitly created two tiers of H-1B employers with two separate sets of evidentiary requirements. Defendant's rules were designed to eliminate targeted employers from the H-1B program. These

rules set special evidentiary criteria that only applied to targeted employers and were effectively impossible to satisfy.

### C.  Attempts to Unlawfully Eliminate Targeted Employers from the F-1 STEM OPT Program.

Third, in early 2018, without any notice to the public, the agency changed its website governing the F-1 STEM OPT visa (a visa category utilized by the targeted employers to train recent graduates from US colleges and universities).  Via a website change, Defendant explicitly eliminated the targeted employers from participating in the STEM OPT F-1 visa program. Defendant also sought to penalize students who were employed by the targeted employers and who had complied with the rules as they existed prior to the website rule change.  Following litigation, the agency was forced to publicly abandon this unlawful rule change.  *See* 3:18-cv-01823-K, *ITSERVE ALLIANCE, INC. v. NIELSEN* (NDTX 2018).

### D.  Changes to Adjudication and Delays of Spousal Employment Authorization Documents (EAD) Prevent Spouses from Accessing a Defined Entitlement.

Fourth, the Agency's treatment of dependent spouse's applications for work authorization reveals bad faith. Indian nationals currently have a backlog on immigrant visas that will delay their adjustment of status to permanent resident (green card) for up to 150 years for professionals holding advanced degrees and 17 years for professionals holding a bachelor's degree. https://www.cato.org/blog/150-year-wait-indian-immigrants-advanced-degrees. (accessed May 29, 2019).

Approval of the immigrant petition does not grant the green card or any independent immigration status.  The approved immigrant petition essentially establishes the persons place in line.  Consequently, these H-1B holders and their H-4 dependents must extend their nonimmigrant visa multiple times before getting a green card.

An approved immigrant petition also grants immediate family of the primary H-1B beneficiary with the ability to work in the United States upon an approved Form I-765, Application for Employment Authorization.   Not all H-1B derivative beneficiaries (H-4 visa holders) are eligible for employment authorization documents ("EAD").   This benefit is limited to H-4 visa holders whose spouse is also the beneficiary of an approved immigrant visa petition.

The agency previously adjudicated the primary H-1B beneficiary and his/her derivative beneficiary's (H-4) extension applications (Form I-539, Application to Extend/Change Nonimmigrant Status) at the same time as the underlying extension petition.   The agency has changed this, separating the adjudication of the H-1B and H-4 extension applications.   The H-4 is only adjudicated upon approval of the primary beneficiary's H-1B.

Currently the Vermont Service Center is taking up to 8.5 months to process H-4 Form I-536 extension applications.   The California Service Center is taking up to 5 months to process H-4 Form I-536 extension applications.

The agency refuses to accept H-4 Employment Authorization Documents (EAD) until after the H-4 extension had been adjudicated.   When the H-4 extension is approved, the spouse must pay the agency $410 for each application.

Processing times for H-4 EADs are currently approximately five months according to the agency.   https://egov.uscis.gov/processing-times/ (accessed May 29, 2019). On the agency's website it posts information about the H-4 EAD.   https://www.uscis.gov/working-united-states/temporary-workers/employment-authorization-certain-h-4-dependent-spouses   (accessed May 29, 2019).   The agency makes the following points clear:

- The H-4 spouse is not authorized to work until the EAD has been approved and received;
- H-4 EADs will not be backdated to the date of the primary H-1B visa's approval;
- H-4 EADs automatically end when the primary visa expires.

- Working in the United States without an approved valid EAD can create lasting immigration penalties that may prohibit the H-4 from staying in the country and eventually getting a green card.

The agency is currently approving H-1B visa extension for very short periods. Even if the H-4 EAD was approved contemporaneously with the primary petition, it would only be good for the validity period (one day, weeks, months). This requires the H-4 spouse to immediately stop working when the underlying H-1B ends. It also requires the H-4 spouse to pay repeated application fees just to maintain the hope of working.

To put it in perspective, assuming the agency approved an H-1B extension for 12 months, the H-4 would have to wait up to 8 months for their extension approval before they apply for an EAD. Given that the wait time for an EAD is up to 5 months, the H-4 spouse would have paid $410 for a benefit they will never get.

The agency is breaking up the adjudications process and slow rolling adjudications to prohibit H-4 spouses from receiving a lawful benefit.

These examples demonstrate a coordinated and systematic, bad faith attack on the targeted employers and their IT professional H-1B employees. The agency created a series of changes that allow it to remove these H-1B holders from the US economy. This is in direct contradiction of Congress's intent when creating and amending the H-1B statutory authority. Plaintiffs have made a sufficient showing of agency bad faith or affirmative misconduct to warrant discovery.

### IV.   The Agency believes individual delay suits are the sole remedy for its unreasonable delays.

At the May 9, 2019 hearing this Court asked the Agency the appropriate remedy for an unreasonably delayed adjudication. Arg. Transcr. 25-28. The Agency responded by answering:

"courts can . . . certainly compel agency . . . action unlawfully withheld." *Id.* at 25:20-24. This

Court deemed this answer unsatisfactory:

> So you're going to send us back, each of these employers back to individual lawsuits. Every single time. I mean, sir, that is not a satisfactory answer. You had better come up with something better than that. This is too generic a problem for the answer to be that anybody adversely affected has to file independent lawsuits. Lawsuits cost time and money.
>
> The government does not have the strength of power to say to its citizenry, you must sue us each and every time. So now you give me a right answer, tell me whit it is impossible for the agency to evaluate a labor certification and authorize a visa in 30 days or less?
>
> •      •      •
>
> . . . if the remedy is, as you suggest and this is what the agency wants you to say, then you have to say that the plaintiffs can sue each and every time. That may be the agency's position and you are the agency's lawyer and it's not — I can't say it's illegal for them to take that position. It may be wrong, it may not be consistent with the law, but I can't say it's criminal. So you're entitled to express their opinion what they want you to say with your advice.

*Id.* at 25:25 - 26:11, 27:8-15. The Agency's supplemental briefing provides no alternative remedy

for employers dealing with delayed adjudications. Instead, it foreshadows its defense against

individual unreasonable delay lawsuits. Gov't Resp. at 10-13. The only inference this Court (and

Plaintiffs) can draw from the Agency's supplemental brief is that the Agency's position is that the

sole remedy for unreasonable delays in H1B visa adjudications is individual lawsuits in federal

district courts. This answer remains unsatisfactory, especially in light of the Agency's secondary

argument that delay lawsuits will always fail as a matter of law.


## V.      The Agency cannot justify its delays.

After identifying individual suits as the sole remedy for unreasonable adjudication delays,

the Agency goes on to argue that every such suit would fail as a matter of law. Gov't Resp. at 10-

18

14. It argues that the delays are due to a lack of resources, and it uses one declaration to support its claimed lack of resources. But the Agency's declaration is demonstrably unreliable, rendering its claims of lack of resources equally unreliable.

The Agency attached a declaration from the Chief of Service Center Operations, Donald Neufeld.  Mr. Neufeld attributes the 200% increase in H-1B processing times in 2018 to an insufficient number of adjudicators and increase in volume.  [ECF No 20-1].  This Court cannot rely on Mr. Neufeld's declaration because it contradicts other publicly available statistics.

First, Mr. Neufeld's numbers do not compare with the publicly available Form I-129 receipts and processing times. Form I-129 is used to apply for nonimmigrant worker visa petitions for E-2 CNMI, H-1B, H-2A, H-2B, L-1A, L-1B, L-2, O, P, Q-1, and R-1.  The agency reports the average number of months the agency takes to adjudicate all visa categories using that form. According to the agency, its historical processing time for Forms I-129 are:

| | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|---|---|
| I-129   Non-Immigrant Petition   (Premium filed)[7] | 0.6 (Months) | 0.6 | 0.6 | 0.6 | 0.7 |
| I-129   Non-Immigrant Petition  (non Premium filed) | 2.3 | 5.5 | 4 | 3.5 | 4.3 |

---

[7] https://egov.uscis.gov/processing-times/historic-pt (accessed May 29, 2019).

The agency also discloses the total number of Forms I-129 submitted and selected for adjudication each fiscal year.  According to the agency it processed petitions in the following numbers:

| Category[8] | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 (up to Dec 2018) |
|---|---|---|---|---|---|
| E-2 CNMI | Data Not Publicly Available | | | | |
| H-1B | 368,163 | 398,803 | 403,155 | 418,790 | 60,000 |
| H-2A | 14,162 | 10,262 | 11,498 | 13,440 | 2,464 |
| H-2B | 70,179* | 85,202* | 84,037* | Data Not Publicly Available | |
| L-1A, L-1B | 40,198 | 41,755 | 42,807 | 41,293 | 9,761 |
| O[9] | 21,489 | 23,876 | 24,294 | 25,200 | 5,852 |
| P | Data Not Publicly Available | | | | |
| Q-1 | Data Not Publicly Available | | | | |
| R-1 | 8,514 | 8,201 | 8,366 | 8,480 | 2,029 |
| TN[10] | 7,032 | 6,857 | 7,479 | 8,205 | 1,559 |
| Total (including E-2, P, and Q petitions) | 483,643 | 509,636 | 526,435 | 551,021 | 87,971 |
| *USCIS does not publish number of H-2B petitions submitted, only those approved. | | | | | |

When all Form I-129 visa categories are combined the average processing time does not appear to be particularly egregious.  However, the averages hide the fact that delays in adjudication are not felt across all visa categories.  At the time motions were submitted in the case, the processing times were taking up to 12.5 months.  As of May 30, 2019, Form I-129 H-1B processing times at the Vermont Service Center are taking up to14.5 months.

---

[8] Citations to these numbers is included in the appendix.

[9] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/non-immigrant-worker-rfe-h-1b-quarterly-data-fy2015-fy2019-q1.pdf

[10] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/non-immigrant-worker-rfe-h-1b-quarterly-data-fy2015-fy2019-q1.pdf

In order to balance out the averages for all visa types utilizing Form I-129, processing times for all other nonimmigrant visa categories are necessarily much lower than the average, and consequently much lower than the targeted employer's H-1Bs.  As seen in the table above, total petitions adjudicated for Fiscal Years 2015-2019 indicate consistent and modest increases.  Mr. Neufeld's assertion that insufficient manning caused the 200% increase in H-1B processing times cannot be justified by the numbers.

The numbers *do not* show an increase in petitions that justifies a 200% increase in H-1B processing times.  For instance, from FY 2016 to 2017 Form I-129 petitions increased 3.29% and processing times *decreased* 27.27%.  In FY 2017 to 2018 Form I-129 petitions increased 4.67% and processing times *decreased* 12.5%.[11]  Yet Mr. Neufeld attributes a 200% *increase* in only H-1B processing times to this same 4.67% increase in all Form I-129 petitions.  The numbers do not agree with the declaration.

### A.  The Declaration is Inconsistent with Published Records Regarding the Agency's Efforts to Combat the Backlog.

Second, Mr. Neufeld also discussed the efforts his division has undertaken to combat the H-1B backlog, including training new employees, and increasing the number of locations where petitions are adjudicated.  However, according to the agency's FY 2016 report to Congress these actions began in 2016. *USCIS Service Center Operations, Fiscal Year 2016 Report to Congress*, pg. 7 and 8 (January 18, 2017). https://www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Service%20Center%20Operations.pdf. (accessed May 29, 2019).

---

[11] Curiously, in FY 2017 to 2018, the increase in H-1B petitions was slower than the overall Form I-129 increase, registering at 3.88%

He also notes that "H-1B petitions are generally eligible for Premium Processing Service." Doc't 20-1, ¶ 9.  That premium service guarantees a decision on the petition within 15 days for a fee of $1,410.  *Id.* ¶ 10.  Mr. Neufeld continues on to say "[d]uring certain periods, USCIS has suspended premium processing service." *Id.* ¶ 11.  He provides no examples of when the agency has taken this measure. The only known instances where the agency has suspended premium processing occurred in the last two years, with the agency prohibiting only H-1B petitions from utilizing the premium service starting in March 2017 and March 20, 2018.[12]  This effectively precluded all initial H-1B visas from premium processing.  The agency expanded and prolonged this ban on H-1B visas using premium processing on August 28, 2018.[13]

On March 11, 2019, only after targeted employers FY 2019 H-1B cap petitions had been unadjudicated for almost a year, did USCIS grant employers the privilege of paying premium processing and getting a decision within 15 days.[14] Thus, while the agency claims to have been taking all measures to expedite the adjudication of H-1B petitions, the facts indicated they intended to slow the process down by eliminating premium processing, issuing RFEs to targeted companies, and obstructing the program.

### B.  The Agency Cannot Blame Personnel Levels for Delays.

Finally, Mr. Neufeld's comments about resources are belied by the Agency's most recent assessment of the man-hours it takes to actually adjudicate a Form I-129. In 2016, the agency

---

[12] https://www.uscis.gov/archive/uscis-will-temporarily-suspend-premium-processing-all-h-1b-petitions (accessed May 29, 2019).
https://www.uscis.gov/news/alerts/uscis-will-temporarily-suspend-premium-processing- fiscal-year-2019-h-1b-cap-petitions (accessed May 29, 2019).
[13] https://www.uscis.gov/news/uscis-extends-and-expands-suspension-premium-processing-h-1b-petitions-reduce-delays (accessed May 29, 2019).
[14] https://www.uscis.gov/news/alerts/uscis-resumes-premium-processing-all-h-1b-petitions (accessed May 29, 2019).

conducted notice and comment rulemaking and adjusted its fees to increase per petition revenue. Final Rule, 81 Fed. Reg. 73292 (October 24, 2016).   In setting the current fee for a Form I-129 adjudication the agency noted that service wide the average time spent adjudicating a petition for nonimmigrant worker was 0.83 hours, or 49.8 minutes.  Proposed Rule, 81 Fed. Reg. 26903, 26925 (July 5, 2016).   At the time the Final Rule was promulgated the agency had 3,441 adjudicators working in four service centers across the country.  *USCIS Service Center Operations, Fiscal Year 2016 Report to Congress*, pg. 7 and 8 (January 18, 2017).  Vermont and California Service Centers accounted for the vast majority of H-1B adjudicators with Texas and Nebraska Service Centers beginning to handle some of the volume.  *Id.*

The Vermont (1,021 employees) and California (943 employees) Service Centers accounted for the vast majority of H-1B adjudications in FY 2015, 2016, and into FY 2017.  *Id.* These employees processed all Form I-129s, including H-1B petitions, at an average rate of one per 0.83 hours, or 49.8 minutes. Assuming the agency did not allow overtime for adjudicators (which on information and belief the agency pays overtime to handle backlogs and cap H-1B petitions), based upon the agency's published time requirement for Form I-129 adjudications (0.83 hours per petition) working 8 hour days, 40 hour weeks, and 52 week years, adjudicators at the Vermont and California Service Centers could adjudicate *all* Form I-129, not just H-1B, petitions filed annually as seen below:

| 1,000 employees assigned to Form I-129 Adjudication can adjudicate | 500 employees assigned to Form I-129 Adjudication can adjudicate |
|---|---|
| 830 I-129s an hour. | 500 employees can process 415 I-129s an hour |
| 6640 in a day | 3,320 in a day |
| 33,200 in a week | 16,600 in a week |
| 1,726,400 in a 52 week year. | 863,200 in a 52 week year |

Based on the above data, Mr. Neufeld's declaration that personnel constraints caused massive delays in the adjudication of approximately 400,000 H-1B petitions (but not other visa categories using Form I-129) seems to be factually unsupportable.

Mr. Neufeld's declaration is insufficient to address this Court's concerns about the delays because it contradicts the Agency's own publications. It is clear this declaration was created for purposes of litigation and intended to support the Agency's claims at all costs (even to the truth). Because the Plaintiffs have identified very serious problems with the declaration, this Court should allow Plaintiffs to use discovery to identify the actual facts on the ground. At a minimum, it should allow Plaintiffs to take a Rule 30(b)(6) deposition of the Agency. This will be the only way to get answers for the unreasonable delays H1B employers are facing.

May 30, 2019                                    Respectfully Submitted,

*s/Jonathan D. Wasden*
JONATHAN D. WASDEN
5616 I. OX Road, PO BOX 7100
FAIRFAX STATION, VA 22039
(P) 703.216.8148
(F) 703.842.8273
jdwasden@economic-immigration.com
MSB 100563
DDC MS0011

*s/Bradley B. Banias*
BRADLEY B. BANIAS
Barnwell, Whaley, Patterson & Helms, LLC
288 Meeting Street, Suite 200
Charleston, South Carolina 29401
(P) 843.577.7700
(F) 843.577.7708
SC Bar No.: 76653
D.D.C. No.: SC0004

Attorneys for Plaintiff

24

## CERTIFICATE OF SERVICE

I declare that I filed the foregoing on the court's electronic filing system, which forwarded an electronic copy to all counsel of record.

May 30, 2019                                Respectfully submitted,

_s/Jonathan D. Wasden_
JONATHAN D. WASDEN
5616 I. OX Road, PO BOX 7100
FAIRFAX STATION, VA 22039
(P) 703.216.8148
(F) 703.842.8273
jdwasden@economic-immigration.com
MSB 100563
DDC MS0011
Attorneys for Plaintiff